UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

ALEXA MATEO,

                         Plaintiff,                    **MEMORANDUM & ORDER**
                                                       14-CV-6109 (MKB)

           v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                         Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Alexa Mateo filed the above-captioned action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner of Social Security (the "Commissioner")

denying her claim for Supplemental Security Income benefits.  Plaintiff moves for judgment on

the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the

Administrative Law Judge Gal Lahat (the "ALJ") (1) failed to properly weigh the medical

evidence by not according Plaintiff's treating psychiatrist and treating therapist appropriate

weight and by improperly relying on the opinion of the consulting psychiatric evaluator in his

assessment of Plaintiff's residual functional capacity ("RFC"), and (2) improperly assessed

Plaintiff's credibility.  (Pl. Mot. for J. on Pleadings, Docket Entry No. 10; Pl. Mem. in Supp. of

Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 11.)  The Commissioner

cross-moves for judgment on the pleadings, claiming that the ALJ's decision is supported by

substantial evidence and should be affirmed.  (Comm'r Not. of Cross-Mot. for J. on Pleadings,

Docket Entry No. 15; Comm'r Mem. in Supp. of Cross-Mot. for J. on the Pleadings ("Comm'r

Mem."), Docket Entry No. 16.)  For the reasons set forth below, Plaintiff's motion for judgment

on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I. Background

Plaintiff is a thirty-six-year old woman who has a Bachelor's degree in education. (R. 82, 92–93.) Plaintiff last worked in September of 2011 as a teacher's assistant. (R. 82–83, 107–08, 175.) On September 23, 2011, Plaintiff applied for Supplemental Security Income ("SSI") benefits, alleging a disability since August 29, 2011 due to a heart condition — myocardial bridging of the left anterior descending artery, anxiety and depression. (R. 165–174, 200.) Plaintiff's application was denied. (R. 121–24.) Plaintiff requested a hearing before the ALJ, which was held on January 2, 2013. (R. 75–114.) By decision dated March 4, 2013, the ALJ found that Plaintiff was not disabled, and the ALJ denied Plaintiff's application. (R. 50–74.) On August 20, 2014, the Appeals Council denied review of the ALJ's decision. (R. 1–7.)

### a. Plaintiff's testimony

In June of 2010, Plaintiff suffered a minor heart attack.[1] (R. 84.) Plaintiff fainted while at a friend's house, and she was taken to the hospital. (R. 84.) Plaintiff was initially sent home, but she returned to the hospital the next day. (R. 84.) Plaintiff underwent testing and was told that she had experienced a minor heart attack. (R. 84.) Plaintiff was hospitalized for a month. (R. 84.) After she was discharged from the hospital, Plaintiff took two months off from her work

---

[1] Plaintiff presented medical records as to her heart condition, and the ALJ made determinations regarding that condition. (R. 57–62, 67.) However, Plaintiff "does not dispute the physical limitations found by the ALJ," which relate to her heart condition. (Pl. Mem. 1 n.3.) Because these findings are not contested, the Court does not summarize the record as to Plaintiff's heart condition, including the relevant conclusions of the ALJ, except to the extent is may inform an understanding of Plaintiff's psychological conditions, which is the basis for Plaintiff's appeal of the ALJ's disability determination.

as a teacher's assistant at a YMCA, and she returned to work part-time in September of 2010. (R. 85–86.) Plaintiff continued to experience chest pains after she returned to work. (R. 81, 85.)

After she returned to work, Plaintiff also experienced anxiety and depression and began "calling out a lot" due to anxiety or panic attacks. (R. 85.) At the time of the hearing, Plaintiff's panic attacks varied in frequency from between twice a day to once a week, with "at least" eight attacks each month. (R. 90.) The attacks ranged in duration from five to twenty minutes. (R. 90.) Her symptoms during a panic attack include sweating, twitching, chest tightness, lightheadedness, jaw tightness, hand shaking, stuttering and sometimes "seeing black spots." (R. 85, 90.) In response to a panic attack, Plaintiff will lie down in her room and try to calm herself. (R. 91.) Plaintiff also has problems sleeping and cannot sleep more than four hours a night. (R. 86.) She also "sees shadows," for example in the corner of a wall or in an adjacent room, as often as a couple times a day, and "feel[s] like she's going crazy." (R. 86.)

Plaintiff sees her psychiatrist, Dr. Raymond Tam, M.D., every three weeks and her therapist, David Ackerman, once a week. (R. 87.) Dr. Tam has prescribed Citalopram for Plaintiff's anxiety and Ambien for her insomnia. (R. 87–88.) Plaintiff has not noticed any improvement in her symptoms from the prescribed medication, and Dr. Tam has increased the dosages over time. (R. 98.) Plaintiff misses medical appointments sometimes when her anxiety is "really bad." (R. 87.) She usually gets a ride to her appointments because she does not like the crowds on buses and trains. (R. 99.) Plaintiff attempted suicide in 1997, when she was seventeen years old. (R. 91.) Since that time, she has had no psychiatric hospitalizations since that time. (R. 96.) Prior to her treatment with Dr. Tam, Plaintiff had not received psychiatric care. (R. 96.)

Plaintiff lives with her two children, who were fifteen and six-years old at the time of the hearing. (R. 91.) Plaintiff is able to do "light cooking" most of the time, but her older daughter handles the household chores, including cleaning and laundry. (R. 91.) Her older daughter also helps with grocery shopping. (R. 101.) Plaintiff is able to dress and bathe herself. (R. 101.) Sometimes she forgets to pay her bills. (R. 102.) Plaintiff drives her younger child half of a mile to school approximately twice a week, but her daughter's father picks Plaintiff's daughter up from school almost every day. (R. 94.) On the weekends, Plaintiff's daughters visit with their respective fathers. (R. 95.) When Plaintiff has anxiety and stays in her room, her older daughter cares for her younger daughter. (R. 95.) During the day, Plaintiff usually stays home. (R. 101.) On good days, she watches television and cooks, and on bad days, she stays in her room. (R. 101.) In the summer of 2012, Plaintiff traveled to Florida for a week with her children to visit their godparents. (R. 99–100.) Plaintiff stayed with her cousin and remained in the house, while her children were picked up by their godparents during the day. (R. 100.)

### b. Plaintiff's work history

Plaintiff last worked in September of 2011 as a part-time teacher's assistant at a YMCA, and she stopped working due to her anxiety. (R. 82–83, 98, 107–08, 172, 175.) Plaintiff received short-term disability benefits from the YMCA through February of 2012. (R. 97–98.) Before becoming a teacher's assistant, Plaintiff worked as a legal assistant for six years and as a cashier for approximately two years. (R. 83.)

### c. Vocational expert's testimony

Amy Leopold, a vocational expert, described Plaintiff's job as a teacher's aide as light work with a specific vocational preparation ("SVP") of "3." (R. 107.) She described Plaintiff's work as a cashier as light work with an SVP of "2." (R. 107.) She described Plaintiff's

secretarial work at a law firm as sedentary with an SVP of "8." (R. 107.) The ALJ asked

Leopold to consider a hypothetical individual with Plaintiff's age, education and work

background:

> Assume the individual can lift and carry 20 pounds occasionally and 10 pounds frequently. The individual can stand [or] walk for six hours of [an eight-hour work day], sit for six hours out of eight. The individual can occasionally climb, stoop, kneel, crouch and crawl. Furthermore, the individual would be limited to work that does not require interaction with the public, and . . . would be defined as low stress, and by that I mean work that would not require more than an average pace or production demands.

(R. 108.) Leopold testified that such a person would be unable to perform any of Plaintiff's past

work. (R. 109.) The ALJ also asked Leopold whether there were jobs in the national economy

for this hypothetical individual. (R. 109.) Leopold testified that there were jobs available as a

table worker, file clerk or warehouse support worker, all of which entail either sedentary or light

work with an SVP of "2." (R. 109.) According to Leopold, even if the hypothetical individual

had an additional requirement of being able to perform the essential functions of a job

independently, this individual would still be able to perform these jobs. (R. 109.) When the ALJ

added that the hypothetical individual would also be "markedly limited" in her ability to

maintain attention and concentration for extended periods and in her "ability to perform activities

within a schedule[], maintain regular attendance and to be punctual," Leopold stated that the

identified jobs would not be sustainable for such an individual. (R. 110.) When the ALJ again

altered the hypothetical and asked about an individual who is also "markedly limited" in her

ability "to work in coordination with or proximity to others without being distracted by them"

and her ability "to complete a normal work . . . week without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and length

[of] rest periods," Leopold stated that the identified jobs would not be sustainable for such an individual. (R. 111.)

### d. Medical evidence[2]

### i. Long Island Consultation Center

From September of 2011 through the time of her appeal of the Commissioner's determination, Plaintiff received mental health treatment from healthcare professionals at Long Island Consultation Center ("LICC"), including Dr. Raymond Tam, M.D. Plaintiff first visited Dr. Tam at LICC on September 27, 2011. (R. 446.)

#### 1. Dr. Raymond Tam

Dr. Tam conducted a psychiatric examination of Plaintiff on September 27, 2011. (R. 446–47.) Dr. Tam noted that Plaintiff was on leave from her job and complained of several symptoms she had been experiencing as of early 2011, including anxiety with panic symptoms, a depressed mood, crying spells "for no reason," poor sleep and appetite, and a lack of interest in things. (R. 446.) Plaintiff reported that her primary care physician had prescribed Xanax about a month prior to her visit with Dr. Tam and had recommended she seek mental health treatment. (R. 446.) Plaintiff also related that she had been sexually abused as a child. (R. 446.) Plaintiff reported that her younger child's father had ended their relationship in December of 2010 but her still assisted Plaintiff with their child. (R. 446.) Plaintiff also reported that she experienced job stress, stating that her employer "wanted to get rid of her." (R. 447.) Plaintiff denied suicidal ideations, and Dr. Tam observed that Plaintiff was "not psychotic." (R. 447.) Dr. Tam also

---

[2] In addition to the medical evidence discussed in this Memorandum and Order, the record also contains medical evidence related to treatment by Dr. Gupta Otis, Dr. Mark Balek and Dr. Brian Cullingford, and consultative examinations by Dr. John Joseph and Dr. R. Blaber. These records relate to Plaintiff's heart condition, which is not at issue in this case. Therefore, the Court did not consider this evidence and will not include it in this Memorandum and Order.

observed that Plaintiff's mood was sad, that she was appropriately groomed, and that her affect was appropriate. (R. 447.) Dr. Tam diagnosed Plaintiff as having panic disorder and adjustment disorder with mixed anxiety and depressed mood, and assessed a global assessment of functioning ("GAF") of 65.[3] (R. 447.) He prescribed Celexa, an antidepressant, and recommended that Plaintiff continue mental health therapy. (R. 447.)

On October 18, 2011, Plaintiff cancelled an appointment with Dr. Tam because she was not feeling well that day. (R. 448.) Dr. Tam reported in his notes that Plaintiff stated that she felt "a bit better emotionally" with the prescription of Celexa. (R. 448.) Dr. Tam noted that Plaintiff was not psychotic and that she was seeing her therapist regularly. (R. 448.) On November 8, 2011, Plaintiff reported to Dr. Tam that she was "feeling better on Celexa" and that her panic attacks were becoming "much less intense" and "less frequent." (R. 448.) Dr. Tam noted that Plaintiff reported that she no longer had crying spells and denied suicidal ideation, but also reported that she was only sleeping a few hours each night. (R. 448.) Dr. Tam observed that Plaintiff's mood was neutral and her affect appropriate, and that she was not psychotic. (R. 448.) Dr. Tam directed Plaintiff to continue taking Celexa. (R. 448.)

On December 13, 2011, Plaintiff saw Dr. Tam and reported experiencing increased anxiety, after seeing a violent picture drawn by her daughter. (R. 449.) Dr. Tam noted that Plaintiff had panic attacks "a few times a week," that she was uncomfortable in crowds, and that

---

[3] The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)). "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Id.* (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34.)).

she was therefore doing her shopping online. (R. 449.) Dr. Tam observed that Plaintiff's mood was anxious and her affect was appropriate and that Plaintiff was not psychotic. (R. 449.) Plaintiff denied suicidal ideation. (R. 449.) Dr. Tam increased Plaintiff's dosage of Celexa. (R. 449.)

Plaintiff visited Dr. Tam for further appointments on January 10, February 7, March 6, April 3, May 1, July 13, August 10, and September 14 of 2012. (R. 449–51, 488–89, 497.) At each of these appointments, Dr. Tam observed that Plaintiff's mood was neutral and that her affect was appropriate and that Plaintiff did not appear to be psychotic. (R. 449–51, 488–89, 497.)

At each appointment, Dr. Tam directed Plaintiff to continue taking Celexa, (R. 449, 451, 497), and, on February 7, 2012, he again increased Plaintiff's dosage of Celexa, (R. 450). On July 13, 2012, Dr. Tam prescribed Ambien as needed for insomnia and directed Plaintiff to resume taking Celexa, which she had run out of and stopped taking for two weeks due to a lapse in her health coverage "for a while due to her move." (R. 488.) On August 10, 2012, Dr. Tam noted that Plaintiff reported she was hesitant to take Ambien due to concerns about becoming addicted. (R. 488.) On September 14, 2012, Dr. Tam discontinued Plaintiff's Celexa prescription and prescribed Zoloft, which Plaintiff was to begin taking after she stopped using Oxycodone, which she was taking at the time for a foot injury. (R. 489.)

Plaintiff's complaints to Dr. Tam varied by appointment. Plaintiff denied having suicidal ideations at each appointment, (R. 449–51, 488–89, 497), until September 14, 2012, when Plaintiff reported vague suicidal ideation at times but denied any plan or intent, (R. 489). On January 10, 2012, Plaintiff reported that she felt calmer on an increased dosage of Celexa. (R. 449.) She complained of feeling "a bit sad" due to the holiday season and that she had

become frustrated because she was unable to take her children to a movie due to overcrowding. (R. 449.) On February 7, 2012, Plaintiff complained of experiencing sad moods two to three times per month and reported that she "tends to stay to herself and does not want to be bothered." (R. 450.) Plaintiff reported that she had no hallucinations or delusions. (R. 450.) On March 6, 2012, Plaintiff told Dr. Tam that, while on an increased dosage of Celexa, she felt less anxious but more depressed. (R. 450.) At the April 3, 2012 appointment, Plaintiff reported to Dr. Tam that she was "much less anxious" but that she still felt sad, "partly due to her situation." (R. 451.) Plaintiff told Dr. Tam that she had been depressed most of her life. (R. 451.)

On May 1, 2012, Plaintiff reported to Dr. Tam that she had "been feeling good for the past week." (R. 497.) Plaintiff reported that she had spent the week of Easter by spending time with her daughters at home, visiting a friend, seeing a movie, and going to the park. (R. 497.) On July 13, 2012, Plaintiff complained of insomnia. (R 488.) On August 10, 2012, Plaintiff reported that she felt depressed with insomnia and complained of occasionally seeing shadows. (R 488.) On September 14, 2012, Plaintiff complained of a depressed mood, off and on, with decreased concentration, forgetfulness and insomnia. (R. 489.) Plaintiff stated that she saw shadows at times, as she had since childhood, but denied having delusions. (R. 489.) She reported that her uncle had molested her when she was a child. (R. 489.)

Dr. Tam completed a "Psychiatric / Psychological Impairment Questionnaire" on September 14, 2012. (R. 473–80.) He stated that he had seen Plaintiff for monthly medication sessions since September 27, 2011. (R. 473.) Dr. Tam diagnosed Plaintiff as having "major depression, recurrent" and "rule-out posttraumatic stress disorder" ("PTSD").[4] (R. 473.) He

---

[4] "Rule-out" references a provisional diagnosis to be ruled out with further medical investigation. *See Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-825, 2015 WL 6115648, at

assigned Plaintiff a GAF score of 55, with a lowest GAF score over the previous year of 60.

(R. 473.) Dr. Tam's clinical findings included: poor memory; appetite disturbance with weight

change; sleep disturbance; mood disturbance; anhedonia or pervasive loss of interests; feelings of

guilt or worthlessness; difficulty thinking or concentrating; suicidal ideation; decreased energy;

and intrusive recollections of a traumatic experience. (R. 474.) Dr. Tam identified Plaintiff's

primary symptoms as depressed mood, fatigue, lack of interest, poor sleep and appetite, and

forgetfulness. (R. 475.) Dr. Tam stated that Plaintiff was being treated with Zoloft. (R. 478.)

Dr. Tam also noted that Plaintiff had been hospitalized in 1997 due to an overdose of pills.

(R. 475.)

Dr. Tam concluded that Plaintiff was incapable of even low stress work because of her

depression, which made it difficult for her to focus on tasks, resulting in "a low frustration

tolerance." (R. 479.) Dr. Tam opined that Plaintiff was "markedly" limited in her ability

to: maintain attention and concentration for extended periods; work in coordination with or

proximity to others without being distracted by them; complete a normal workday and workweek

without interruptions from psychologically based symptoms; and perform at a consistent pace

without an unreasonable number and length of rest periods. (R. 476–77.) Dr. Tam found

Plaintiff to be "moderately" limited in her abilities to: remember locations and work-like

procedures; understand, remember and carry out detailed instructions; perform activities within a

---

*16 n.38 (S.D.N.Y. Oct. 16, 2015) (explaining that psychiatric diagnoses were "rule-out or hypothetical diagnosis needing further exploration"); *Beach v. Comm'r of Soc. Sec.*, No. 11-CV-2089, 2012 WL 3135621, at *8 (S.D.N.Y. Aug. 2, 2012) ("In the medical context, a 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." (quoting *Carrasco v. Astrue*, No. 10-CV-43, 2011 WL 499346, at *4 (CD. Cal. Feb. 8, 2011)); *Kilkenny v. Astrue*, No. 05-CV-6507, 2009 WL 1321692, at *7 (S.D.N.Y. May 12, 2009) ("Dr. Li used the abbreviation . . . for 'rule out.' Thus, it appears that Dr. Li noted . . . that a possible PTSD diagnosis — post-traumatic stress disorder — was to be revisited and ruled out at a later point in time.").

schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 476–77.)  Dr. Tam further opined that Plaintiff was "moderately" limited in her abilities to: respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (R. 477–78.)

With respect to her understanding and memory, Dr. Tam further opined that Plaintiff was "mildly" limited in her ability to understand and remember very short and simple instructions.  (R. 476.)  With respect to her sustained concentration and persistence, Dr. Tam also found that Plaintiff was "mildly" limited in her ability to carry out very short and simple instructions.  (R. 476.)  As to social interaction, Dr. Tam indicated that Plaintiff was "mildly" limited in her abilities to: ask simple questions or request assistance and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (R. 477.)  Dr. Tam found that Plaintiff was "mildly" limited in her ability to be aware of normal hazards and take appropriate precautions.  (R. 478.)

Plaintiff again visited Dr. Tam on October 5, 2012, and reported that she would begin her Zoloft prescription.  (R. 489.)  Dr. Tam observed that Plaintiff's mood was sad, her affect was appropriate, and she had no delusions.  (R. 489.)  Plaintiff told Dr. Tam that she saw shadows at times, but denied suicidal ideations.  (R. 489.)

## 2. David Ackerman

According to a March 29, 2012 letter written by David Ackerman, a licensed clinical social worker ("LCSW"), addressed "to whom it may concern," Plaintiff was under treatment at LICC for a panic disorder with intermittent episodes of depression. (R. 469.) Mr. Ackerman wrote that Plaintiff had "a history of psychiatric hospitalization [and] (took pills) for depression." (R. 469.) He opined that, due to her condition, Plaintiff was unable to work for at least twelve months from the date of the letter. (R. 469.)

Mr. Ackerman also completed a "Psychiatric / Psychological Impairment Questionnaire" dated April 16, 2012. (R. 453–60.) Mr. Ackerman indicated that he had been treating Plaintiff for a panic disorder weekly since September 8, 2011. (R. 453.) He stated that Plaintiff's GAF score was 59, and that her lowest GAF score in the past year had been 57. (R. 453.) His clinical findings consisted of: sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolations; blunt, flat, or inappropriate affect; decreased energy; and hostility and irritability. (R. 454.) He described Plaintiff's primary symptoms as anxiety, depression, and irritability, with anxiety being the most severe. (R. 455.) Mr. Ackerman stated that Plaintiff was being treated with Celexa, without side effects, and that she had reportedly been hospitalized twice for her symptoms. (R. 458, 455.)

With regard to Plaintiff's functioning, Mr. Ackerman opined that Plaintiff was "markedly" limited in almost all aspects of her understanding and memory, social interaction, and adaptation, including her abilities to: remember locations and work-like procedures; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without

supervision; work in coordination with, or proximity to, others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently. (R. 455–58.) With regard to sustained concentration and persistence, Mr. Ackerman indicated that Plaintiff was "moderately" limited in her ability to carry out simple one or two-step instructions, and "markedly" limited in all other aspects. (R. 456–57.)

Mr. Ackerman further noted that Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from such situations or experience an exacerbation of the signs and symptoms of her panic attacks. (R. 458.) He concluded that Plaintiff was incapable of even "low stress" work. (R. 459.)

### ii. Dr. Arlene Broska, consultative psychiatric examiner

On January 25, 2012, Dr. Arlene Broska, Ph.D., conducted a psychiatric examination of Plaintiff at the request of the Social Security Administration. (R. 354–57.) Plaintiff described her treatment for anxiety and depression and her suicide attempt as a teenager. (R. 354.) Plaintiff stated that the symptoms of her anxiety include eye and lip twitching, teeth grinding and trembling. (R. 355.) Plaintiff reported difficulty sleeping and complained of weight gain of twenty-three pounds in the previous six months. (R. 354.) Plaintiff reported dysphoria that comes and goes, crying "out of nowhere," and yelling at her children frequently. (R. 354.)

Plaintiff stated that she "does not want to go out," which makes her feel badly because her children want to go out.  (R. 354.)  Plaintiff denied having any suicidal ideation.  (R. 354–55.)

On examination, Dr. Broska noted that Plaintiff's demeanor and responsiveness to questions was "cooperative."  (R. 355.)  Dr. Broska also noted that Plaintiff's "manner of relating, social skills, and overall presentation were adequate."  (R. 355.)  She observed that Plaintiff was "casually dressed and well groomed."  (R. 355.)  Plaintiff had a "normal" gait, posture and motor behavior and her eye contact was "appropriate."  (R. 355.)  Dr. Broska observed that Plaintiff's thinking was "coherent and goal directed" and that her affect was "full range" and "appropriate." (R. 355.)  Plaintiff's mood was "neutral."  (R. 355.)   Plaintiff's attention and concentration were "intact," and her memory skills were "within normal limits." (R. 356.)  Dr. Broska deemed Plaintiff's insight and judgment to be "intact."  (R. 356.)

Dr. Broska diagnosed Plaintiff as having depressive disorder, "[not otherwise specified]". (R. 357.)  Dr. Broska opined that the examination was "consistent with psychiatric problems" but that "in itself, [the condition] did not appear to significantly interfere" with Plaintiff's ability to "function on a daily basis."  (R. 356.)  Dr. Broska noted that Plaintiff is able to dress, bathe and groom herself and that she cooks four times a week and cleans twice a week.  (R. 356.)  Dr. Broska also noted that Plaintiff's older daughter "helps her with activities of daily living."  (R. 356.)  Dr. Broska opined that Plaintiff can "follow and understand simple directions" and that she can "perform simple tasks independently."  (R. 356.)  Dr. Broska also opined that Plaintiff was able to maintain attention and concentration and that her memory was "within normal limits."  (R. 356.)  Dr. Broska concluded that Plaintiff can "make appropriate decisions" and that she "may" have "difficulty relating adequately with others and appropriately dealing with stress."  (R. 356.)

### iii. Dr. T. Bruni, state agency consultative psychiatric examiner

On February 21, 2012, Dr. T. Bruni, a state agency psychological consultant, examined Plaintiff, reviewed the medical evidence, and completed a psychiatric review technique form at the request of the Social Security Administration. (R. 400–13.) Dr. Bruni opined that Plaintiff's affective disorder and anxiety-related disorder did not meet the criteria of Sections 12.04 and 12.06, respectively, of the SSA's Listing of Impairments. (R. 400.) Dr. Bruni diagnosed Plaintiff with "depressive disorder, [not otherwise specified]" and panic disorder. (R. 403, 405.) He opined that Plaintiff had "mild" restrictions of activities of daily living, "mild" difficulties in maintaining social functioning and "mild" restrictions in maintaining concentration, persistence, or pace. (R. 410.) Dr. Bruni further opined that Plaintiff "never" had repeated episodes of deteriorations. (R. 410.)

Dr. Bruni completed a mental RFC assessment. (R. 414–16.) Dr. Bruni opined that Plaintiff was "not significantly limited" in any aspects of understanding and memory, social interaction or adaptation. (R. 414–15.) As to Plaintiff's sustained concentration and persistence, Dr. Bruni opined that Plaintiff was "moderately" limited with regard to her ability to maintain attention and concentration for extended periods, but that Plaintiff was "not significantly limited" as to any other aspects of this area, including with respect to her abilities to carry out short and simple or detailed instructions, to perform activities within a schedule, to work in coordination with, or proximity to, others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 414.) Dr. Bruni opined that "despite a severe impairment," Plaintiff had the mental capacity to understand and

follow directions, sustain attention and concentration for simple tasks, respond and relate adequately to others and adapt to simple changes.  (R. 416.)

### e.  Additional evidence

#### i.  Function questionnaire

On November 9, 2011, Plaintiff completed a "function questionnaire" as part of her application for SSI benefits.  (R. 220–25.)  Plaintiff indicated that she did not need any "special help or reminders" to care for her personal needs and grooming.  (R. 221.)  She stated that she prepares light meals daily with the assistance of her daughter.  (R. 221.)  Once each month, for between twenty and forty-five minutes, she shops online or in stores for food and clothing, and her daughter handles the shopping when Plaintiff "can't go."  (R. 222.)  Plaintiff can pay her bills and handle a savings account.  (R. 222.)  Her hobbies and interests include reading and watching television, which she does daily, and sometimes "playing sports."  (R. 222.)  Plaintiff stated that sometimes she is unable to speak.  (R. 223.)  She has difficulty getting along with other people and has lost a job because her boss "yelled at [her] in front of other people."  (R. 224.)  She has trouble remembering things, and has to write down appointments and "what people tell [her] to do or say to [her]" in order to remember.  (R. 224.)  Plaintiff described her anxiety, and stated that the symptoms began "around January."  (R. 224.)  While the attacks used to occur daily, at the time of the questionnaire, Plaintiff stated they occurred weekly.  (R. 224.)  Her panic attacks occur "spontaneously," during which she experiences fear, rapid heartbeat, sweating and confusion.  (R. 224.)  To manage the attacks, she needs to be in a room by herself.

### f.  The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA").  First, the ALJ found

that Plaintiff had not engaged in substantial activity since September 23, 2011, the application date. (R. 55.) Second, the ALJ found that Plaintiff had the following severe impairments: "a history of myocardial bridging with mildly reduced left ventricular systolic function and a mental impairment with diagnoses of major depression, panic disorder, and rule out diagnosis for posttraumatic stress disorder."[5] (R. 55.)

Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets, or is equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 56.) The ALJ considered Listings 12.04, pertaining to affective disorders, and 12.06, pertaining to anxiety related disorders, and determined that Plaintiff's "mental impairment does not meet or medically equal the criteria" of those listings.[6] (R. 56.) The ALJ explained that Plaintiff can establish such a mental impairment, through the "paragraph B criteria," if the condition results in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (R. 56.) As to the first category, the ALJ determined that Plaintiff has only a "mild restriction" in activities of daily living, based on Plaintiff's statements in the function report and at her consultative examination that she participated in activities including cooking, self-care, cleaning and caring for her children. (R. 56.) As to the second category, the ALJ determined that Plaintiff has only "moderate," and

---

[5] The ALJ noted that the record also contained evidence of additional impairments, which he found were not severe because they caused only minimal limitations to Plaintiff's ability to perform basic work activities. (R. 55.)

[6] The ALJ also considered Listing 4.00, which pertains to heart conditions, and found that the record did not show a "cardiovascular impairment severe enough" to satisfy the listing. (R. 56.) Plaintiff does not appeal this finding.

not "marked," difficulties in social functioning. (R. 56.) The ALJ acknowledged that Plaintiff avoids crowds "sometimes," but also found that she spent time with family and friends, saw movies, and went to the park. He noted that the record reflected that Plaintiff was able to "adequately interact" with her medical providers and that, at the consultative examination, Plaintiff had an "adequate" manner of relating and social skills. (R. 56.) As to the third category, the ALJ determined that Plaintiff has "mild to moderate difficulties" with "concentration, persistence, or pace." (R. 56.) The ALJ noted that Plaintiff "reported difficulty concentrating" but also noted that cognitive testing at the consultative examination "showed intact attention, concentration and memory." (R. 56.) Finally, the ALJ determined that Plaintiff has experienced "no episodes of decompensation . . . of extended duration." (R. 56.) Thus, the ALJ found that Plaintiff's mental impairment does not cause at least two "marked limitation" or "repeated" episodes of decomposition. (R. 57.) The ALJ also found that Plaintiff's mental impairment did not meet the "paragraph C criteria" in Listings 12.04 and 12.06. (R. 57.)

Next, the ALJ determined that Plaintiff "has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(h)." (R. 57.) The ALJ found that Plaintiff is "unable to engage in work requiring interaction with the public as well as work requiring direct interaction with co-workers to complete essential job functions" and that she is "limited to low stress work, which is defined as work requiring no more than an average pace or average production demands."[7] (R. 57; *see* R. 67.) With respect to Plaintiff's mental impairment, the ALJ determined that, despite her ongoing treatment, the record reflects

---

[7] The ALJ found that Plaintiff can lift or carry and push or pull twenty pounds "occasionally" and ten pounds "frequently," that she can stand or walk for six hours in an eight-hour workday and that she "can climb, stoop, kneel, crouch, and crawl occasionally and must avoid work at high exposed places as well as in proximity to moving mechanical parts." (R. 57.)

"generally normal mental status examinations."  (R. 67.)

As to Plaintiff's disability, the ALJ determined that, while Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained."  (R. 59.)  The ALJ stated that he considered seven factors as well as the objective medical evidence in assessing Plaintiff's credibility.[8]  (R. 59.)  The ALJ noted that the record "reflects ongoing care" for Plaintiff's mental impairment, but he stated that it also "reflects an active life style."  (R. 59.)  The ALJ noted Plaintiff's "sad mood with some crying" and that Plaintiff experienced "anxiety with crowds and interaction," but he also stated that she nevertheless "appears able to maintain good relations with her family members."  (R. 59–60.)

The ALJ found Plaintiff's "mental status examinations" to be "within normal limits." (R. 59–60.)  He also found that the "extent" of Plaintiff's "medication use is limited," as she is "prescribed only one psychotropic medication with occasional use of a sleep aid," although he noted the increase in the dosage of her prescription.  (R. 60.)  The ALJ found that the record "fails to reflect any difficulties in interaction with her medical providers."  (R. 60.)  The ALJ

---

[8]  The factors, as listed by the ALJ, are:

> (1) The claimant's daily activities; (2) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) Precipitating and aggravating factors; (4) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment that the claimant uses or has used to relieve pain or other symptoms . . . ; and (7) Other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(R. 59.)

further determined that the record "provides limited support" for Plaintiff's report of "seeing shadows" and "no evidence as to any psychotic features that interfere with her functioning." (R. 60.)

The ALJ also stated that Plaintiff's reported daily activity level was "varied" and that, while she testified to having "very limited activities," her report to the consultative examiners reflected a "greater level" of activity. (R. 60.) In particular, the ALJ noted that Plaintiff stated in her function questionnaire that she prepares light meals, shops in stores and online once a month for twenty to forty-five minutes, reads and watches television every day and plays sports, though not every day. (R. 60.) Finally, the ALJ stated that the record "reflects an overall weak work history." (R. 60.) Thus, the ALJ concluded that Plaintiff's "allegations of disability are not supported by the record as a whole." (R. 60.)

In reaching this conclusion, the ALJ accorded the opinion of the psychiatric consultative examiner, Dr. Broska, "considerable weight" because the opinion "followed an examination by a duly qualified specialist," was "supported by the examination findings," specifically "a mental status examination that was within normal limits," and was "consistent with the record overall showing limited medication use and a generally active lifestyle." (R. 63.) The ALJ explained that Dr. Broska diagnosed Plaintiff with "depressive disorder not otherwise specified," and noted that Dr. Broska opined that, while Plaintiff "may at times have difficulty relating adequately with others and appropriately dealing with stress," Plaintiff can follow and understand simple directions and instructions, perform simple tasks "independently," maintain attention and concentration, perform complex tasks "independently," and make "appropriate decisions." (R. 63.)

The ALJ accorded "some weight" to the opinion of state mental consultant, Dr. Bruni,

that while Plaintiff had a "severe mental impairment," she could nevertheless follow and understand directions, sustain attention and concentration for simple tasks and respond and relate adequately to others. (R. 63.) However, the ALJ gave "little weight" to Dr. Bruni's assessment that Plaintiff has depressive disorder and panic disorder with mild limitation in activities of daily living, because Dr. Bruni is a non-examining source and his assessment that Plaintiff has "no more than mild limitations consistent with a [non-severe] mental impairment" was "contrary" to the evidence as a whole." (*Id.*)

The ALJ accorded "some but not great weight" to the opinion of Dr. Tam, who diagnosed Plaintiff with "major depression recurrent moderate and rule out posttraumatic stress disorder." (R. 66.) The ALJ noted that Dr. Tam opined that Plaintiff has "mild to moderate limitations in understanding and memory," although as to "sustained concentration," Dr. Tam opined that Plaintiff's limitation is "marked . . . in maintaining attention and concentration for extended periods, working in coordination with others without being distracted, and being able to complete a normal workweek and perform at a consistent pace without psychological interruptions." (R. 66.) The ALJ further noted that Dr. Tam opined that Plaintiff has "mild to moderate limitations in adaptation" and that she is incapable of even low stress work because of depression, difficulty focusing, and low frustration tolerance. (R. 66.) The ALJ determined that Dr. Tam's opinion was "not wholly supported by the underlying records, which denote limited symptoms, and fairly intact functioning." (R. 66.) The ALJ noted that Plaintiff's course of care with Dr. Tam had been "conservative" in that she was prescribed "only one medication" at the time Dr. Tam rendered his opinion. The ALJ found that the "record as a whole fails to support extensive interpersonal problems" and pointed to the fact that Plaintiff reported spending Easter weekend with her daughters, visiting friends, watching movies and going to the park. (R. 66.)

The ALJ also noted that the GAF scores assigned to Plaintiff by Dr. Tam, 55 and 60, indicate moderate symptoms. (R. 66.)

The ALJ accorded "little weight" to Plaintiff's treating therapist, licensed clinical social worker Mr. Ackerman, who diagnosed Plaintiff with panic disorder and opined that Plaintiff has marked limitations in understanding and memory, sustained concentration, social interaction and adaption and further opined that Plaintiff is incapable of low-stress work.[9] (R. 65.) The ALJ found that, while Mr. Ackerman is a treating source with a mental health specialty, his assessment is "wholly unsupported by the record as a whole and the psychiatric treatment notes and the course of treatment limited [Plaintiff] to only therapy and one anti-depressant." (R. 65.) The ALJ stated that, while Mr. Ackerman noted that Plaintiff had been hospitalized twice for symptoms, the record reflects no mental health related hospitalizations after the onset date and indicates no urgent care during the relevant time period. (R. 65.) The ALJ also noted that the GAF scores assigned by Mr. Ackerman "denote no more than moderate symptoms." (R. 65.)

Finally, the ALJ determined that Plaintiff was not capable of performing her prior relevant work as a teacher's aide or office clerk, because those jobs required tasks that exceeded the RFC assessed by the ALJ. (R. 67.) The ALJ concluded that, given Plaintiff's age, education and work experience, jobs in the national economy that Plaintiff can perform existed in significant numbers. (R. 68.) The ALJ determined that the vocational expert's testimony that a hypothetical individual with an RFC matching that of Plaintiff could work as a table worker or a mail sorter, is consistent with the information in the Dictionary of Occupational Titles. (R. 68.)

---

[9] The ALJ also considered a letter, dated March 29, 2012 and from a licensed clinical social worker at LICC whose name the ALJ could not discern, which stated that Plaintiff is unable to work for the next twelve months due to the chronic nature of her condition. (R. 64.) The ALJ assigned this opinion "little weight." (R. 64.)

Therefore, the ALJ determined that since September 23, 2011, the date of Plaintiff's application, she has not been suffering from a "disability" as this term is defined under the SSA. (R. 69.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

SSI is available to individuals, among others, who are "disabled" within the meaning of the Act.[10] For purposes of SSI eligibility, to be considered disabled under the Act, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the

---

[10] SSI is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. The only issue before the Court is whether Plaintiff is disabled.

fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings, arguing that the ALJ failed to (1) properly weigh the medical evidence by not according Plaintiff's treating psychiatrist, Dr. Tam, and her treating therapist, Mr. Ackerman, appropriate weight and by improperly relying on the opinion of the consulting psychiatric evaluator in his assessment of Plaintiff's RFC, and (2) properly evaluate Plaintiff's credibility in determining her RFC. (Pl. Mem. 9–19.) The Commissioner cross-moves for judgment on the pleadings and argues that the ALJ's determination should be upheld as supported by substantial evidence because the ALJ (1) properly weighed the medial evidence and (2) properly determined Plaintiff's credibility. (Comm'r Mem. 21–28.)

### i. Treating physician rule

Plaintiff argues that the ALJ erred in according reduced weight to the opinions of Plaintiff's treating psychiatrist, Dr. Tam, and her treating therapist, Mr. Ackerman, even though their opinions were supported by corroborating evidence and were not contradicted by substantial evidence in the record. (Pl. Mem. 9–17.) The Commissioner argues that the ALJ properly discounted the opinions of Dr. Tam and Mr. Ackerman because the opinions were

inconsistent with medical evidence in the record, including Dr. Tam's treatment records. (Comm'r Mem. 22–26.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[11]  20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and

---

[11]  A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

For the reasons discussed below, the Court finds that the ALJ (1) failed to adequately explain his reasons for affording only moderate weight to the opinion of Dr. Tam, Plaintiff's treating psychiatrist, thereby violating the treating physician rule and (2) also failed to provide adequate reasons for affording little weight to the opinion of Mr. Ackerman, Plaintiff's treating therapist.

### 1. The ALJ did not properly address Dr. Tam's findings

The ALJ accorded "some weight" to Dr. Tam's opinion, (R. 66), which was based on a year of meeting with Plaintiff for monthly medication sessions and prescribing first Celexa and then Zoloft to Plaintiff, (R. 473, 478). Dr. Tam opined that Plaintiff was incapable of even low stress work due to her diagnosed major depression, which made it difficult for her to focus on tasks and reduced her frustration tolerance. (R. 473, 479.) Dr. Tam further opined that Plaintiff

was "markedly" limited in various abilities related to attention and concentration, including the ability to maintain attention and concentration for extended periods; work in coordination with, or proximity to, others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 476–77.) Dr. Tam's opinion was supported by clinical findings that included: poor memory; appetite disturbance with weight change; sleep disturbance; mood disturbance; anhedonia or pervasive loss of interests; feelings of guilt or worthlessness; difficulty thinking or concentrating; suicidal ideation; decreased energy; and intrusive recollections of a traumatic experience. (R. 474.) Dr. Tam also stated that Plaintiff's primary symptoms were depressed mood, fatigue, lack of interest, poor sleep and appetite, and forgetfulness. (R. 475.)

The ALJ found that Dr. Tam's opinion was "not wholly supported by the underlying records, which denote limited symptoms, and fairly intact functioning." (R. 66.) The ALJ emphasized that Plaintiff's course of treatment with Dr. Tam had been "conservative" in that she was prescribed "only one medication" at the time Dr. Tam rendered his opinion. (R. 66.) The ALJ noted that the GAF scores assigned to Plaintiff by Dr. Tam indicate "moderate symptoms." (R. 66.) The ALJ concluded that the "record as a whole fails to support extensive interpersonal problems." (R. 66.) In particular, the ALJ noted that Plaintiff had reported to Dr. Tam that she spent an Easter weekend with her daughters, visiting friends, watching movies and going to the park. (R. 66.)

In determining that the underlying records did not support Dr. Tam's opinion as to Plaintiff's capacities, the ALJ appears to have considered ways in which Dr. Tam's opinion was not supported by the objective medical evidence. However, the ALJ erroneously failed to

acknowledge the ways in which Dr. Tam's opinion *was* consistent with the objective medical evidence. *See Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support Dr. Schwarz's opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to Dr. Schwarz's opinion was lacking."); *Larsen v. Astrue*, No. 12-CV-00414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspects of [the treating physician's] findings and ultimate conclusions, . . . the ALJ did not elaborate on how this evidence affected the weight accorded to [the treating physician's] opinions.").

In concluding Dr. Tam's treatment of Plaintiff showed only "limited symptoms" and "fairly intact functioning," the ALJ did not address the portion of the record indicating that Plaintiff presented to Dr. Tam with persistent symptoms of anxiety and depression, occasional visual hallucinations, and at least one record of a reported suicidal ideation. (R. 447, 449, 450, 488, 489.) Plaintiff had cancelled at least one appointment because she felt too unwell to attend. (R. 448.) She reported sleeping only a few hours each night. (R. 448, 488.) She complained of decreased concentration and forgetfulness.[12] (R. 489.) As to Plaintiff's social functioning, while

_____

[12] It is acceptable for Dr. Tam to have relied on Plaintiff's self-reported symptoms when diagnosing mental impairments. *See Polis v. Astrue*, No. 09-CV-379, 2010 WL 2772505, at * 10 (E.D.N.Y. July 13, 2010) ("Mental impairments are difficult to diagnose . . . [and] 'a patient's report of complaints, or history, is an essential diagnostic tool.'" (quoting *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003))); *Santana v. Astrue*, No. 12-CV-0815, 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013) ("It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder." (citation omitted)).

the ALJ highlighted Plaintiff's reported social activities during an Easter weekend, he did not also consider Plaintiff's many reports to Dr. Tam that she felt uncomfortable in crowds, which she stated prevents her from traveling by public transportation and taking her children to the movies. (R. 448, 449.) Moreover, the ALJ did not identify or consider evidence in Dr. Broska's report which is consistent with Dr. Tam's opinion, including evidence that Plaintiff reported difficulty sleeping, weight gain, crying "out of nowhere," frequently yelling at her children, and an aversion to leaving her home despite her children's requests to do so. (R. 354.) Because the ALJ failed to address these corroborating facts before concluding that Dr. Tam's opinion was inconsistent with the record, his decision to assign only "some" weight to Dr. Tam's opinion is not supported by substantial evidence and is subject to remand.[13]

The ALJ also concluded that Dr. Tam's opinion was inconsistent with Plaintiff's "conservative" course of treatment. (R. 66.) The opinion of a treating physician is not to be "discounted merely because he has recommended a conservative treatment regimen." *Burgess*, 537 F.3d at 129 (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)) (holding that the fact that a claimant took "only over-the-counter medicine to alleviate her pain" could support the conclusion that the claimant was not disabled only if such evidence was "accompanied by other

---

[13] The ALJ's failure to address evidence in support of Dr. Tam's opinion is particularly troubling given the ALJ's ultimate conclusion that the record reflects "generally normal mental status examinations." (R. 67.) The ALJ determined that the record is "indicative of some restriction consistent with an inability to engage in work requiring interaction with the public and direct interaction with co-workers" and that Plaintiff is "limited to low stress work," consistent with Dr. Tam's conclusions. (R. 67.) However, the ALJ did not find that Plaintiff's capacity for sustained concentration was reduced to the extent that Dr. Tam had concluded it was. (R. 67.) Instead, the ALJ found that cognitive testing at the consultative examination "showed intact attention, concentration and memory." (R. 56.) Notably, when asked to consider a hypothetical individual with "marked" limitations in the areas of attention and concentration and pace, the vocational expert found that jobs otherwise identified as available to a hypothetical individual with limitations similar to Plaintiff's limitations as identified by Dr. Tam would be "unsustainable." (R. 110–11.)

substantial evidence"); *see Holman v. Colvin*, No. 12-CV-5817, 2014 WL 941823, at *6

(S.D.N.Y. Mar. 11, 2014) (finding that the ALJ "erroneously rel[ied]" on evidence that reflected

"solely conservative treatment" and the efficacy of such treatment); *Ortiz Torres v. Colvin*, 939

F. Supp. 2d 172, 183 (N.D.N.Y. 2013) (An ALJ "cannot discount a treating physician's opinion

because the physician has recommended a conservative treatment regimen." (citing *Burgess*, 537

F.3d at 129)). The ALJ noted that Plaintiff was prescribed "only one medication," (R. 66),

without also considering that Dr. Tam had increased the dosage of Plaintiff's medication over

time and changed Plaintiff's prescription in response to indications that the initial medication

was ineffective. In relying on an assertion that such treatment was "conservative," the ALJ

improperly determined that Plaintiff's condition was not severe. *See Burgess*, 537 F.3d at 129;

*Shaw*, 221 F.3d at 134–35 (finding that evidence of the "intermittent nature of treatment" fell

"far short of the standard for contradictory evidence required to override the weight normally

assigned the treating physician's opinion").

The ALJ's reliance on the conservative nature of Plaintiff's treatment to conclude that

Plaintiff did not suffer from a disability is not "accompanied by other substantial evidence." *See*

*Shaw*, 221 F.3d at 134. The evidence relied on by the ALJ was the "moderate" GAF scores

assigned to Plaintiff. (R. 66.) The Second Circuit has not assessed "whether a GAF generally

provides a reliable basis for disability determinations," but the court has recently acknowledged

that this proposition has been "questioned by several courts, both before and after the removal of

the GAF metric from the fifth edition of the Diagnostic and Statistical Manual of Mental

Disorders." *Rock v. Colvin*, 628 F. App'x 1, 3 n.3 (2d Cir. 2015) (first citing *Berry v. Comm'r of*

*Soc. Sec.*, No. 14-CV-3977, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015); then citing

*Schneider v. Colvin*, No. 13-CV-790, 2014 WL 4269083, at *4 & n.5 (D. Conn. Aug. 29, 2014)

(collecting cases); and then citing *Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)). As one district court in this Circuit has explained, "[a]t a basic level . . . [t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation." *Mainella*, 2014 WL 183957, at *5 (internal quotation marks and citations omitted). Even assuming that a GAF score may be useful evidence of a claimant's disability or lack thereof, Dr. Tam's GAF scores are not sufficient "substantial evidence" to support the ALJ's decision to discount Dr. Tam's opinion. *See Shaw*, 221 F.3d at 134. Nor is such evidence sufficient when combined with the ALJ's finding of a "conservative" course of treatment.

Finally, the ALJ also appears to have relied primarily on the findings of Dr. Broska, who examined Plaintiff on a single occasion. The ALJ gave "considerable" weight to Dr. Broska's opinion and cited it as objective medical evidence contradictory to Dr. Tam's opinion. (R. 62–63.) Dr. Broska assessed Plaintiff as being more capable of performing certain tasks than Dr. Tam did. For example, in contrast to Dr. Tam's conclusions that Plaintiff was "markedly" limited in various abilities related to attention and concentration, (R. 476–77), and that Plaintiff's primary symptoms included a lack of interest and forgetfulness, (R. 475), Dr. Broska's opinion states that Plaintiff's attention and concentration skills were intact and that her memory skills were within normal limits, (R. 356). However, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In particular, "[i]n the case of mental disabilities, '[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function" and thus it is "vital" to "review all pertinent information relative to [the claimant's] condition, especially at times of increased stress." *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23,

2015) (second, third and fourth alterations in original) (quoting 20 C.F.R. Pt. 404, subpt. P, App 1 § 12.00(E)); *see Hernandez v. Astrue*, 814 F.Supp.2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.' This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" (citations omitted)); *Fofana v. Astrue*, No. 10-CV-0071, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011) ("[I]t is true that the opinion of a consultative physician 'should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist . . . .'" (citations omitted)), *report and recommendation adopted*, No. 10-CV-71, 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011); *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) ("Generally, the opinion of a consultative physician, who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating psychotherapist.").

By failing to consider evidence corroborating Dr. Tam's opinion and selectively focusing on the conservative treatment and Plaintiff's GAF scores to conclude that Dr. Tam's opinion lacked support, the ALJ failed to provide good reasons supported by substantial evidence for according Dr. Tam's opinion reduced weight. *See Sanders*, 506 F. App'x at 77 (Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."); *see also Roman v. Astrue*, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y.

2010))). This failure violates the treating physician rule, and warrants remand.

## 2. The ALJ did not properly address Mr. Ackerman's findings

The ALJ accorded "little weight" to the opinion of Plaintiff's treating therapist Mr. Ackerman, who at the time he rendered his opinion, on April 16, 2012, had been treating Plaintiff with weekly therapy sessions for seven months, since September of 2011. (R. 453.) Mr. Ackerman concluded that Plaintiff was incapable of even "low stress" work. (R. 459.) He opined that Plaintiff was "markedly" limited in almost all aspects of understanding and memory, social interaction and adaptation. (R. 455–58.) The clinical findings on which he based his assessment included: sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolations; blunt, flat, or inappropriate affect; decreased energy; and hostility and irritability. (R. 454.) He described Plaintiff's primary symptoms as anxiety, depression, and irritability, with anxiety as the most severe. (R. 455.) Mr. Ackerman assigned Plaintiff a GAF score of 59, and stated that her lowest GAF score in the past year was 57. (R. 455.)

The ALJ was not required to give controlling weight to Mr. Ackerman's opinion, as a therapist is not an "acceptable medical source[]" within the meaning of the Regulations and his opinions cannot be afforded controlling weight. 20 C.F.R. §§ 416.912, 416.927(a)(2). However, opinions from non-acceptable medical sources must still be considered in determining "the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to do work." *Id.* § 416.913(d). In addition, opinions from "other sources," such as a therapist, may be probative as to the severity of an individual's impairments and how they affect the claimant's ability to function. *Kohler*, 546 F.3d at 268–69 (noting that opinions from treating sources that

are not considered acceptable medical sources under the Commissioner's Regulations are still entitled to "some extra consideration"); *see Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (stating that the opinion of a nurse practitioner who treated the claimant on a regular basis was entitled to "some extra consideration").

Although the ALJ properly determined that Mr. Ackerman is a treating source with a mental health specialty, he concluded that Mr. Ackerman's opinion was entitled to minimal weight because his assessment was "wholly unsupported by the record as a whole." (R. 65.) The ALJ specifically noted that he found Mr. Ackerman's opinion to be inconsistent with Dr. Tam's psychiatric treatment notes and Dr. Tam's conservative course of treatment for Plaintiff, which was limited "to only therapy and one anti-depressant." (R. 65.) The ALJ acknowledged Mr. Ackerman's note that Plaintiff had been hospitalized twice for "her symptoms," but he emphasized that the record does not reflect any urgent care during the relevant time period. (R. 65.) The ALJ also noted that the GAF scores assigned by Mr. Ackerman "denote no more than moderate symptoms." (R. 65.)

It is within the ALJ's "discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him." *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995). Nevertheless, the ALJ is required to adequately explain his decision to accord Mr. Ackerman's opinion reduced weight, particularly given that Mr. Ackerman's treatment of Plaintiff was both consistent and frequent and spanned the course of seven months. *See Mortise v. Astrue*, 713 F. Supp. 2d 111, 126 (N.D.N.Y. 2010) ("[A]n 'other sources' opinion is not treated with the same deference as a treating physician's opinion, but is still entitled to some weight, especially when there is a treatment relationship with the [p]laintiff."); *Pogozelski v. Barnhart*, No. 03-CV-2914, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (finding that

"some weight should still have been accorded to [the therapist's] opinion based on his familiarity and treating relationship with the claimant"); *White v. Comm'r*, 302 F. Supp. 2d 170, 174–76 (W.D.N.Y. 2004) (remanding because the ALJ failed to give appropriate weight to the plaintiff's social worker, who had a regular treatment relationship with the plaintiff and whose diagnosis was consistent with that of the treating psychiatrist); *Mejia v. Barnhart*, 261 F. Supp. 2d 142, 148 (E.D.N.Y. 2003) (finding that a treating psychotherapist's report "should have been accorded more than 'little' weight" and that the report "relating the severity of [the] plaintiff's mental illness and degree of impairment should have been accorded at least equivalent weight" because the treating psychiatrist "saw plaintiff on a regular basis and offered a diagnosis consistent with that of the treating psychiatrist").

Instead, for largely the reasons explained above with respect to the opinion of Dr. Tam, the ALJ discounted Mr. Ackerman's opinion, relying heavily on his own assessment that Plaintiff's treatment was "limited" to therapy and a single medication, and that the record reflected "moderate" GAF scores. Moreover, as with Dr. Tam, the ALJ failed to acknowledge or consider evidence consistent with Mr. Ackerman's opinion before reaching his conclusory finding that Mr. Ackerman's opinion was "wholly unsupported by the record." (R. 65.) The ALJ's failure to adequately explain his decision not to credit Mr. Ackerman's opinion is grounds for remand.

### ii.   The ALJ's assessment of Plaintiff's credibility

Plaintiff argues that the ALJ erred in finding that she was not credible as to the intensity, persistence and limiting effects of her impairment because the ALJ improperly weighed whether Plaintiff's testimony was consistent with the medical evidence in the record. (Pl. Mem. 17–19.) The Commissioner argues that the ALJ correctly determined Plaintiff's credibility because her

testimony was inconsistent with substantial evidence in the record. (Comm'r Reply 22–28.) Because the Court remands the case for further consideration of the medical evidence, the Court will not address Plaintiff's remaining arguments, as the ALJ's errors impact the Court's ability to review the credibility determinations.

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 28, 2016
      Brooklyn, New York